**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 07-cv-01664-CMA

THOMAS TALAMANTES,

      Plaintiff,

v.

MICHAEL J. ASTURE,
Commissioner of Social Security,

      Defendant.

---

## ORDER

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Thomas Talamantes appealed from the denial of disability benefits by the Social Security Commissioner ("Commissioner"). After a hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that Plaintiff was not "disabled" within the meaning of the Social Security Act because Plaintiff could perform gainful work within the regional and national economies despite his low back injury.

### BACKGROUND

### I.   MEDICAL HISTORY

Plaintiff was born on October 11, 1953. He was 50 years old at the alleged onset of his disability. (Admin. Record (hereafter "Admin.") at 26.) Plaintiff has a high school education, can communicate in English and has previously been employed in the armed forces as a tree trimmer, cook's assistant and cook. (*Id.* at 27.) Plaintiff originally

claimed that he became disabled on June 16, 2000, due to back problems.  (Pls. Opening Br. at ii.)  However, Plaintiff withdrew this date and modified his alleged onset date in a revised application for benefits.  He now alleges that he became disabled in June 9, 2004 due to chronic back pain, depression, high cholesterol and high blood pressure.  (*Id.* at 22.)  Plaintiff last met insured status requirements of the Social Security Act on December 31, 2005.  (*Id.*)

Plaintiff's primary complaint is chronic back pain as a result of an injury he suffered in 1975.  The medical history in the record dates back to 2001 and consists of multiple examinations by various medical and non-medical sources.  Most of the medical information comes from the Veterans Affairs ("VA") Medical Center, where Plaintiff received nearly all of his treatment.  Plaintiff admits that he smokes cigarettes (and marijuana) daily.  Examining medical professionals and social workers apparently told him to quit on multiple occasions to no avail.

On May 5, 2001, an x-ray showed "mild scoliosis and bony spurring present." (*Id.* at 196.)  On May 10, 2001, a musculoskeletal exam showed:

> lower thoracic scoliosis to the right, approximately 5 degrees.  There was no spinous process tenderness with palpation or percussion. . . .  The patient was unable to extend or move laterally, secondary to complaints of low back pain.  There was no hip pain with percussion.  He was able to squat, however, he was not able to toe or heel walk, secondary to complaints of low back pain.

(*Id.* at 200.)  Despite Plaintiff's complaints, a straight leg raise test was negative (*i.e.,* Plaintiff's results were normal) and the examiner found 5/5 (full) strength in his lower extremities.  (*Id.* at 197.)  Plaintiff's reflexes were also intact.  (*Id.*)  At this point, Plaintiff treated his pain with Advil and marijuana.  (Pls. Opening Br. at 1.)

In August 2001, notes by a nurse practitioner indicate that Plaintiff's x-rays "were both normal" and that Plaintiff had seen a physical therapist for a TENS unit[1] and exercises. Plaintiff stated that the TENS and exercises "are quite effective in decreasing his low back pain especially the exercises." (Admin. at 192.) Plaintiff also controlled his pain with Naprosyn and methocarbamol. (*Id.*) A September 2001 MRI showed minor scoliosis (a finding repeated throughout the medical history) and mild to moderate spinal canal stenosis (narrowing of the spinal canal), but no neurological deficit. (*Id.* at 233.)

In November 2001, a physical exam by Danny Scott, M.D. showed that Plaintiff was in "mild distress," with "stooped forward" posture and tenderness. (*Id.* at 191.) Plaintiff could bend forward to approximately one foot from the floor, albeit with midline back pain. (*Id.*) However, Plaintiff demonstrated two positive Waddell signs, which may indicate overreaction or exaggeration of pain symptoms.[2] (*Id.* at 192.) Plaintiff also used a homemade cane that was not prescribed by any of his doctors. (*Id.*) The possible exaggeration of his symptoms (as indicated by the Waddell signs and cane use) is a common theme in the medical history. For example, in January 2002, a nurse practitioner noted that Plaintiff demonstrated "Exaggerated pain behaviors

---

[1] A TENS unit is a portable battery-powered device that sends electrical impulses to certain parts of the body to block pain signals. (Defs. Brief at 6 n. 9.)

[2] Waddell tests are five maneuvers performed during a routine physical exam. Positive Waddell signs (*e.g.,* superficial and nonanatomic tenderness and complaints of weakness of muscle groups that cannot be explained on a neurological basis) indicate that "nonorganic issues play an important role in the persistence of symptoms." (Defs. Brief at 17 n. 14.) In other words, positive Waddell tests indicate non-medical or psychosomatic origins of symptoms.

including grimacing, wincing and exaggerated difficulty getting up from a sitting position."  (*Id.* at 189.)

At a later examination for a determination regarding Plaintiff's VA disability benefits, the examining doctor noted that Plaintiff walked with a "somewhat stooping position and somewhat flexed knees.  The lumbosacral spine showed no tenderness, no spasms noted."  (*Id.* at 187.)  At this exam, Plaintiff could bend forward 55 degrees, bend laterally to right and left 25 degrees and extend 25 degrees, each time with pain across the lower back.  He could also rotate left and right 30 degrees without pain and straight leg raising, sitting and supine were negative bilaterally.  (*Id.*)  Notably, the examining M.D. found "No impaired endurance, no weakness [and] no incoordination" as a result of Plaintiff's back problems.  (*Id.*)  The doctor concluded that surgical intervention was unnecessary.  (*Id.* at 189.)  At this point, Plaintiff appears to have managed his pain with Tylenol with codeine.  A July 22, 2002 note in the record indicates that Plaintiff's "mental status is vastly improved."  (*Id.* at 180.)

In August 2002, Plaintiff inquired about increasing his VA disability benefits. (*Id.* at 179.)  However, in contrast to earlier exams, Plaintiff walked erect without an assistive device.  The nurse practitioner who examined him found that Plaintiff was "a 49-year-old man who does not appear to be in acute distress."  (*Id.*)

In October 2003, Plaintiff complained of new symptoms:  pain in the groin that radiated outwards and tingling in both feet.  He complained that Tylenol 3 and Naproxan (a/k/a. Naprosyn) were not helping and that he had trouble driving, kneeling

and sitting.  (*Id.* at 162.)  However, Plaintiff moved easily from supine to standing positions during the exam (*id.*) and Plaintiff's pain was not interfering with his duties at home.  (*Id.* at 180-81.)  X-rays indicated no change from previous (September 2001) films.  (*Id.* at 164.)  A nurse practitioner recommended a trial of more powerful pain killers and referred Plaintiff to a mental health exam for depression.  (*Id.* at 163.)  Plaintiff later indicated that the new medication (Diclofenac) was "working very well for his pain."  (*Id.*)

In November 2003, an NCS/EMG report reflected mostly normal results: "All muscles tested were normal.  Secondary to the patient's inability to relax, the left L4-5 paraspinals could not be thoroughly examined."  (*Id.* at 156.)  However, the doctors did note that atrophy in Plaintiff's left foot muscles may be a result of an L5 or S1 root lesion.  (*Id.* at 157.)

In December 2003, Plaintiff completed a pain questionnaire and a daily activities questionnaire.  (*Id.* at 86-87, 98-99 and 100-07, respectively.)  He reported that he had constant back pain, but that he performed household chores such as vacuuming, laundry, grocery shopping and cooking.  He also stated that he enjoyed drawing, playing music, watching television, listening to the radio and reading newspapers.  (*Id.*)

Upon the mental health referral noted above, Plaintiff saw a State Agency psychiatrist in December 2003 and a licensed clinical social worker in January 2004. The psychiatrist found "No Medically Determinable Impairment."  (*Id.* at 131.) In speaking with the social worker, Plaintiff stated that his back pain had caused him

to become depressed but admitted that he was feeling better over the previous six months.  (*Id.* at 267.)  A depression screen was negative and the social worker found only that Plaintiff was addicted to marijuana, which Plaintiff admitted to smoking once per day since 1975.  (*Id.*)  She recommended exercise and meditation as tools to deal with Plaintiff's pain.  (*Id.*)

In response to "increasing low back pain," Plaintiff underwent an MRI in March 2004.  The reviewing physician found mostly normal results, but noted that "the spinal canal is somewhat small on a developmental basis."  (*Id.* at 273.)  "There is mild disc space narrowing at the L2-3 and L3-4 levels as suspected.  There is early disc desiccation at these two levels as well as at the L4-5 level."  (*Id.*)  The physician concluded that, "There is degenerative change at several levels . . . .  [T]here is mild to moderate spinal canal stenosis at the L3-4 level.  There is no significant foraminal stenosis suspected at any level."  (*Id.* at 274.)  In the same month, Plaintiff reported right hip pain after an extended drive to and from Denver, but he noted that his back pain was controlled by medication.  (*Id.* 262-63.)  A nurse practitioner who examined Plaintiff indicated that the hip pain was likely caused by bursitis or inflammation.

In August 2004, a VA nurse practitioner assessed Plaintiff as having "Anxiety/anger, Chronic LBP [low back pain], Depression, HTN [hypertension], Hyperlipidemia [high cholesterol] and Nicotine addition."  (*Id.* at 260.)  She suggested that Plaintiff again consult a mental health professional and, upon Plaintiff's request,

begin Prozac for his depression.[3]  (*Id* at 259-60.)  However, Plaintiff stated that he "does

not feel going back to Mental Health will be necessary."  (*Id.* at 259.)

On September 1, 2004, Alan R. Brautigam, M.D. arrived at the following

impression after looking at Plaintiff's MRI:

> Findings:  There is a very mild levoscoliosis in the lower lumber spine.
> Alignment is otherwise normal.  Vertebral height is normal.  Disc space is
> at the lower limit of normal at all levels.  There are medium-sized anterior
> and lateral osteophytes [bone spurs] projecting from the upper end-plates
> of the L3 and L4 vertebral bodies.  Small anterior and lateral osteophytes
> at the upper end-plate of L2.  Sclerosis is noted in the articular facet
> region at the L5-S1 level on the right.  This raises the possibility of facet
> arthropathy in this region.
>
> Impression:  Mild degenerative disc disease as described above.

(*Id.* at 272.)

An annual exam in January 2005 indicated that Plaintiff continued to exhibit

exaggerated pain behaviors but that his gait, carriage and other objective test

results (range of motion, strength, sensation and reflex) were normal.  (*Id.* at 252.)

He indicated to the examining nurse practitioner that he was attempting to get increased

VA disability benefits as a result of his back pain.  (*Id.* at 248.)  He also indicated that he

was "coping better with the Prozac, no untoward effects."  (*Id.* at 249.)  One month later,

Plaintiff asked about his diet (to control his cholesterol) and indicated that "he

exercise[s] by walking but wouldn't specify how much."  (*Id.* at 247.)

---

[3]  Plaintiff apparently requested Prozac after taking one of his daughter's pills and
reporting to the nurse practitioner that he "almost immediately felt better."  (Admin. at 259.)

Plaintiff's function report, which he completed in April 2005, indicated that Plaintiff would "gather wood for the day" before relaxing until 4 or 5 p.m., at which time he would start "getting dinner ready." (*Id.* at 100.) He also explained that his pain put him in a bad mood and affected his ability to socialize with friends and neighbors. (*Id.* at 105.) However, he could follow instructions, get along with authority figures, and handle stress and changes in routine. (*Id.* at 105-06.) He used a cane for "long walks" (the cane was still not prescribed by a doctor), could stand or sit for 30 minutes without shifting and could ride in a car for an hour without having to stop and get out to walk around. (*Id.* at 106-07.)

In May 2005, a Residual Functioning Capacity ("RFC") Assessment completed by a non-medical expert found that Plaintiff could occasionally lift 20 lbs, frequently lift 10lbs, stand/walk or sit (with normal breaks) for 6 hours out of an 8 hour day and that his operation of hand or foot controls was unlimited. (*Id.* at 293.) The RFC Assessment noted that limitations on Plaintiff's abilities meant no jobs that required "balancing" and that he could only occasionally climb, kneel or crouch. (*Id.* at 294.) The Assessment again found Plaintiff only "partially credible." (*Id.* at 297.)

Another State agency psychiatrist review conducted in June 2005 found that Plaintiff did not have a severe mental impairment (*Id.* at 300-12.) In January 2006, a non-medical vocational expert determined that Plaintiff retained the Residual Functioning Capacity ("RFC") to perform work requiring light exertion. (*Id.* at 121-29.) The vocational expert found Plaintiff only "partially credible" since Plaintiff had reported

that his medication was working well *until* he asked for an increase in VA disability benefits. (*Id.* at 130.) This vocation expert also testified at Plaintiff's hearing before the ALJ. Finally, in May 2006, Plaintiff again reported back pain, but noted that the pain was better and his mood "more stable." (*Id.* at 331.) Objective tests indicated normal gait, carriage, no limitations on range of motion, intact sensation, no muscle or joint tenderness and full strength in his lower extremities. (*Id.* at 331-32.)

In short, Plaintiff's medical history demonstrates mild spinal problems most likely related to mild scoliosis and mild to moderate constriction of the spinal canal. Despite taking Prozac, Plaintiff's mental health appears normal, if short-tempered. His credibility is questionable at best given the constantly exaggerated pain symptoms and conflicting statements regarding his pain versus his ability to perform physical tasks, for example, to gather wood.

## II.   **PROCEDURAL HISTORY**

Plaintiff "protectively" filed his application for disability benefits in October 2003. (*Id.* at 60.) He amended his application and the filing date was pushed back to February 2005. The Commissioner denied his application. (*Id.* at 44-46.) Plaintiff timely requested a hearing before an ALJ, which occurred August 1, 2006. (*Id.* at 337-62.) The ALJ issued a decision denying Plaintiff's claim on September 26, 2006. (*Id.* at 17-28.) The Social Security Appeals Council denied Plaintiff's request for review of the ALJ's decision. (*Id.* at 4-11.) Thus, the ALJ's decision became the final administrative action. Plaintiff timely requested judicial review in the District Court.

A.     The ALJ Hearing

At the hearing, Plaintiff's testimony again raised questions regarding his credibility.  For example, Plaintiff testified that he last worked in 2004 as a chef, but he also stated that he quit working five or six years ago.  Plaintiff claims the conflict resulted from his poor memory.  He stated that he quit working because he couldn't "bend, squat, you know.  I can't stand there long enough to cook a meal, you know. I just can't do it anymore." (*Id.* at 344.)  Plaintiff stated that he would stay at home doing very little throughout the day, although he could cook meals for his wife, 18-year-old daughter and 14-year-old son. (*Id.*)  He also stated that he couldn't sleep well at night, that he had trouble negotiating stairs, that he couldn't concentrate enough to read. However, none of this testimony was supported by the medical history and, in some cases, the testimony is outright contradictory to the medical history (*e.g.,* alleged problems concentrating).

Plaintiff testified that he took "all kinds of medication" and that he worked out on a exercise ball. (*Id.*)  He also stated that his medication helps the pain "considerably." (*Id.* at 348.)  Notably, he stated that he did not feel the need to see a psychologist or psychiatrist. (*Id.* at 346.)

A vocational expert also testified at the hearing. (*Id.* at 358-61.)  The ALJ asked the expert a series of hypothetical questions corresponding to Plaintiff's functional limitations.  The expert stated that, based on Plaintiff's history, Plaintiff could not perform any of his previous work because he could only perform work that required

light levels of exertion, whereas his previous jobs required moderate levels of exertion. (*Id.* at 359.)  Critically, the vocational expert found that a hypothetical person could perform work in the regional and national economies even if that person could only "work at the light level of exertion, needs to perform work which does not require stooping or more than occasional crouching and crawling and which allows him the opportunity to alternate between sitting and standing at the work place."  (*Id.* at 360.) The expert offered three examples of available work that fit the limitations described by the ALJ and Plaintiff:  gate guard, storage facility rental clerk and video rental clerk. (*Id.*)  According to the expert, even a hypothetical person with the "full extent" of disabilities alleged by Plaintiff in his earlier testimony, could perform the job examples cited.

B.    The ALJ's Decision

The ALJ found that Plaintiff was not disabled because, despite his impairments, Plaintiff could engage in gainful employment within the regional and national economies. The ALJ found:

1.    Plaintiff had not engaged in substantial gainful activity since the onset date, June 2004.

2.    Plaintiff had a severe impairment (degenerative changes of the lumbar spine) and non-severe impairments (hypertension, hyperlipidemia and depression) and that his condition did not meet the requirements of any presumptively disabling impairment.

3.    Plaintiff retained the following RFC, lift 10 pounds frequently and 20 pounds occasionally; stand and/or walk up to six hours out of an eight-hour day; sit up to six hours out of an eight-hour day with the ability to

alternate positions as needed, occasionally crouch or crawl; and never stoop.

4.      Plaintiff could not perform past relevant work, however Plaintiff could perform other jobs, such as those suggested by the vocational expert.

5.      Plaintiff was not disabled prior to December 31, 2005, Plaintiff's last date insured.

(*Id.* at 20-28.)

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act establishes the scope of this Court's review of the Commissioner's denial of disability insurance benefits. *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g). Thus, this Court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See* § 405(g); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The Court must uphold the Commissioner's decision if it is supported by substantial evidence. See *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This Court cannot re-weigh the evidence nor substitute its judgment for that of

the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**I.    ANALYSIS**

Under the standard of review described above and the applicable law described below, the Court affirms the ALJ's decision.

A.    Applicable Law

A claimant must qualify for disability insurance benefits under the Social Security Act. To do so, the claimant must meet the insured status requirements, be less than sixty-five years of age and under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In proving disability, a claimant must make a prima facie showing

13

that he is unable to return to the prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751. The fifth step requires

the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

B. The ALJ Made The Correct Disability Determination.

Plaintiff argues the ALJ erred in three respects: (1) the ALJ violated the Medical Opinion Standards; (2) the ALJ failed to properly determine plaintiff's RFC; and (3) the ALJ did not establish her burden at step five of the process. (Pls. Opening Br. at iv.)

1. The ALJ Did Not Violate the Medical Opinion Standards.

A treating physician's opinions are generally given controlling or considerable weight in reviewing a disability claim. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If the ALJ decides not to give a treating opinion controlling weight, the opinion is still entitled to deference and the ALJ must weigh for the factors in 20 C.F.R. § 404.1527(d)(2) (factors include the length, frequency, nature and extent of treatment relationship). *Id.* If the ALJ completely rejects the treating opinion, she must give specific, legitimate reasons for doing so. *Id.* The ALJ may only reject a treating physician's opinion if the record contains contradictory medical evidence. *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004). Lay opinion or questions regarding credibility are not sufficient to reject a treatment opinion. *Id.* Naturally, the converse is also true – examining opinions are entitled to less weight and agency opinions from

those who have never seen the claimant are entitled to the least weight of all. *Id.* at 1084.

In this case, the ALJ placed "significant weight" on the opinion of the state agency RFC determination in her finding that Plaintiff could work despite his impairments. (Admin. at 26.) The ALJ mistakenly listed the RFC determination as being made by a "State agency physician" when, in fact the determination was made by a non-medical source (an Ed.D. made the vocational assessment). (*Id.* at 292-99.) Plaintiff argues that the ALJ gave improper weight to this RFC Assessment by a non-treating, non-medical source and that this contravened the above-cited authorities.

Plaintiff assumes that the ALJ gave more weight to the state's RFC assessment than to the treating medical professional opinions in the record and that the state RFC assessment conflicts with the treating opinion evidence. However, those assumptions are incorrect. As the ALJ's decision states, "The undersigned notes there are no other opinions from treating or examining physicians in the file which would indicate that the claimant is not capable of . . . the residual functional capacity found above." (*Id.* at 26.) Further, a subsequent review of Plaintiff's medical history makes clear that not one of Plaintiff's treating opinions conflicted with the RFC assessment made by the State agency. The treating opinions in the record *support* the state RFC assessment, they do not conflict with it. Thus, contrary to Plaintiff's argument, the ALJ used the state RFC assessment to bolster the treating medical evidence in the record, not override it. In

other words, the ALJ's decision regarding the amount of weight that she accorded to the state RFC versus Plaintiff's treating professionals is supported by substantial evidence.

Also, Plaintiff accords too much importance to the exact language used by the ALJ in her written decision. The fact that the ALJ gave "significant weight" to the RFC assessment does not mean that she gave it "controlling weight," and her written decision supports this conclusion. For example, the ALJ's opinion states that she "considered all symptoms and the extent to which these symptoms can reasonable be accepted as consistent with the objective medical evidence . . . ." (*Id.* at 24.) As another example, the ALJ dedicates an entire page of her written decision to the relationship between Plaintiff's functioning capacities and the objective medical evidence the ALJ found in the record. (*See id.* at 25.) Further, despite mistakenly labeling the RFC evaluator a "physician," the ALJ's decision makes clear that she would have denied Plaintiff's application without according the RFC assessment "significant weight." Indeed, in discussing the State RFC assessment, the ALJ notes also that "there are no other opinions from treating or examining physicians contained in the file which would indicate the claimant is not capable of [at least] the residual functional capacity found above." (*Id.* at 26.) For these reasons, the Court finds that the error by the ALJ in labeling the RFC evaluation was harmless and that the ALJ's decision regarding how much weight to give the state RFC assessment is supported by substantial evidence.

2.    The ALJ Properly Determined Plaintiff's RFC.

RFC is described as what a claimant is "functionally capable of doing on a regular and continuing basis, despite his impairments; the claimant's maximum sustained work capability."  *Valdez v. Apfel*, 102 F. Supp. 2d 1203, 1205 (D. Colo. 2000) (internal quotations omitted).  The RFC assessment requires a function-by-function analysis.  The ALJ should make RFC assessments, including credibility decisions, based on all of the evidence before her, including the medical history as provided by physicians and other testimony.  *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990); *Hamilton*, 961 F.2d at 1498; *see also* 20 C.F.R. § 404.1546.

Plaintiff argues that the ALJ lacked sufficient evidence from which she could have made a proper RFC determination and, therefore, the ALJ should have made requests to the VA to obtain additional opinion evidence or should have ordered a consultative evaluation.  (Pls. Opening Br. at 14.)  However, there was substantial medical evidence in the record dating back to 2001 and continuing up through 2006 (after the last date Plaintiff was eligible for benefits) and a state RFC assessment on which the ALJ based her RFC analysis.  For example, numerous different doctors, nurse practitioners, and mental health professionals have opinions in the record, in addition to the state RFC opinion discussed above.  In an attempt to refute the RFC assessment, Plaintiff cherry picks a few excerpts from the medical evidence.  However, each of the medical and/or expert opinions in the record actually supports the ALJ's RFC assessment.  Indeed, much of the medical history seems to question the origins

of Plaintiff's symptoms and not one doctor or other professional concludes that Plaintiff's back condition was as severely disabling as Plaintiff has asserted it is.

This case is easily distinguished from *Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993), upon which Plaintiff relies. In *Thompson*, the ALJ improperly relied on Plaintiff's daily activities because there was an absence of medical evidence to make an RFC determination. *Id.* at 1490 (noting that claimant had discontinued treatment before doctor had even made a diagnosis). Unlike *Thompson*, the ALJ in the instant case did not place an improper emphasis on Plaintiff's daily routines and home-making chores in determining his RFC. As noted above, she relied on the significant medical evidence regarding Plaintiff's physical abilities and a state RFC assessment in the record, both of which confirm her RFC analysis.

In short, the ALJ's RFC assessment is supported by substantial medical evidence and there was no reason for the ALJ to request an additional evaluation or opinion evidence.

3.     The ALJ Established Her Burden At Step-Five of the Disability Determination.

At the fifth step of the disability determination, the ALJ must determine whether a claimant can perform substantial gainful work despite any impairments or limitations identified in the previous steps. *Williams,* 844 F.2d at 750-52. The ALJ may rely on testimony of the vocational expert, but only if the hypothetical questions posed to the expert precisely spell out the claimant's vocation factors (*e.g.,* age, education, past work and physical impairments). *Trimiar v. Sullivan*, 966 F.2d 1326, 1333 (10th Cir. 1992). It

is the ALJ's burden to show by substantial evidence that the claimant can perform jobs despite any impairments. *Williams*, 844 F.2d at 750-52.

In this case, Plaintiff claims the ALJ did not precisely relate Plaintiff's impairments to the vocational expert in seeking the expert's opinion on available jobs for people possessing Plaintiff's limitations. (Pls. Opening Br. at 19.) Plaintiff argues that the ALJ should have related Plaintiff's additional allegations to the vocational expert (*e.g.,* that Plaintiff needed to walk around to relieve pain, to take naps during the day, had problems climbing stairs, had an inability to drive and an inability to work alone). (*Id.* at 20.) However, the hearing transcript indicates that the ALJ *did* relate all of Plaintiff's alleged vocational factors to the expert, even those limitations which the ALJ found to lack credibility.

The transcript establishes that the ALJ asked the vocational expert to "assume as to each [hypothetical question], we are talking about a person who has vocational factors similar to those of the claimant this morning." (Admin. at 359.) Then the ALJ spelled out that her hypothetical questions involved a person that required a "light level of exertion, [who] needs to perform work which does not require stooping or more than occasional crouching and crawling and which allows him the opportunity to alternate positions between sitting and standing at the work place." (*Id.* at 360.) This statement alone would probably suffice since the ALJ did not find Plaintiff's additional claims regarding sleep, stairs, driving and working alone to be entirely credible (regardless, they are not supported by the record). However, the ALJ went one step further in

addressing her hypothetical question to the vocational expert. In a second question, she defined her hypothetical person to have exactly the same limitations that Plaintiff had described in his testimony. (*Id.*) This last hypothetical did not change the vocational expert's opinion – the hypothetical person having **all** of Plaintiff's alleged limitations could still work around his impairments in the jobs suggested by the vocational expert.

Under these circumstances, there is substantial evidence to show that the ALJ met her burden of proving that Plaintiff could engage in substantially gainful employment despite his back pain and other more minor impairments.

## CONCLUSION

Plaintiff's Motion for Leave (Doc. # 22) is GRANTED. The Court has reviewed and considered the authorities cited in Plaintiff's Supplemental Opening Brief (Doc. # 23). Contrary to Plaintiff's argument, the cases in the Supplemental Brief do not stand for the proposition that the determination of Plaintiff's RFC must be made by a medical doctor. Rather, the Court reads the cases to hold that the ALJ's determination of Plaintiff's RFC must be supported by medical evidence, which, as noted above and in the ALJ's decision, is the situation in this case.

In sum, there is substantial evidence in the record to support the denial of Plaintiff's application for disability benefits.

Accordingly, it is

ORDERED that the Commissioner's decision is AFFIRMED.

DATED:  February __6__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge